Filed 3/28/22  P. v. Harris CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CAROL LAVERNE HARRIS,<br><br>Defendant and Appellant. | F080231<br><br>(Stanislaus Super. Ct. No. 1251412)<br><br>**OPINION** |

THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Nancy Ashley, Judge.

James S. Thomson, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Levy, Acting P. J., Poochigian, J. and Detjen, J.

## INTRODUCTION

In 2010, appellant and defendant Carol Laverne Harris was convicted of the second degree murder of her husband, Karl Johnson, and sentenced to 15 years to life. In 2014, this court affirmed her conviction.

In 2019, defendant filed a petition in the superior court for resentencing of her second degree murder conviction pursuant to Penal Code[1] section 1170.95, and argued she was improperly convicted under the natural and probable consequences doctrine, and she was not a major participant and did not act with reckless indifference to human life. The court denied the petition.

On appeal, her appellate counsel has filed a brief which summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) We affirm.

## FACTS[2]

On August 30, 2008, defendant called her son, Dasheme Hosley (Dasheme), and falsely said her husband, Karl Johnson (Johnson) had physically abused her. Defendant told Dasheme to come over to her house and handle it. When Dasheme arrived at the house, Johnson hesitated to answer the door, but defendant insisted he do so. When Johnson opened the door, Dasheme fatally shot him.[3]

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The People filed a partial copy of this court's unpublished opinion in defendant's first appeal as an exhibit in opposition to defendant's section 1170.95 petition, with the factual statement, and defendant did not object to the exhibit. On appeal, defendant augmented the record to include the reporter's transcript from her 2010 trial.

Given this background, we take judicial notice of the appellate record and this court's nonpublished opinion in *People v. Harris,* May 22, 2014, F065104, for the factual and procedural background for Harris's conviction and sentence. (Evid. Code, §§ 450, 452, subd. (d), § 459; *In re W.R.* (2018) 22 Cal.App.5th 284, 286–287, fn. 2.)

[3] As will be explained below, Dasheme was charged with murder in this case but was tried separately from defendant. Deleon Hosley, also defendant's son, was charged with being an accessory. For clarity, we refer to the Hosley brothers by their first names; no disrespect is intended.

The prosecution introduced the following evidence to establish what happened before, during, and after the murder, and defendant's statements to the witnesses.

**Desamona Crowder's Testimony**

Desamona Crowder (Crowder) and Dasheme had a child together.[4] In August 2008, Crowder frequented an apartment in San Leandro where Dasheme lived with Alisia Brown. On the night in question, Crowder, Dasheme, and their daughter were at the apartment with Alisa Brown and Lamar Vincent.[5] Crowder and Dasheme were using cocaine.

At some point during the evening, Dasheme received a telephone call. When he hung up, he said it was defendant and that she was crying. He became upset and angry, because the phone call ended or was dropped before he could get the complete story, so he did not know what was wrong. Crowder knew, from having been hit by Dasheme before, that he could be violent when angry and that anything could upset him. Crowder had discussed with defendant the fact Dasheme would sometimes become violent and hit Crowder.

Dasheme told Crowder to call George Willoughby, because they were going to go to Modesto. When Willoughby did not answer his phone, Crowder texted him. Willoughby called Dasheme about 30 minutes later. When Willoughby arrived at the apartment, Dasheme, Crowder, and Vincent got in his car. Crowder knew they were going to Modesto, because she heard Dasheme say that defendant "had got into a fight, and he went to see if something was wrong with her, because when he called, no one was answering the phone, and he wanted to know if she was all right or if she was in trouble."

---

[4] Crowder initially was charged with murder but entered into an agreement to testify in return for which she would plead guilty to being an accessory and sentenced to a year in the county jail.

[5] In her direct examination of Crowder, the prosecutor forgot to elicit the exact date. Other trial evidence clarified it was the night of August 29 to August 30, 2008.

At some point before they left, Dasheme asked, "Why did she call me and tell me this? What did she think I was going to do?"

During the drive to Modesto, Dasheme called defendant to tell her they were on the way. Crowder believed defendant told Dasheme things had worked out and it was just a gin night, because she heard Dasheme repeating that to someone. Crowder believed defendant knew Dasheme was coming, however, because Dasheme said he was not satisfied and was still going to come and check on defendant.

During the drive, Crowder heard Dasheme say that defendant called because her husband was putting his hands on her. Dasheme said he wanted to know if defendant was all right or in trouble, because no one answered the phone when he called.[6] Dasheme tried, unsuccessfully, to get Alfred Newton to physically check on defendant. Crowder believed Newton told Dasheme that he had spoken to defendant, and she was okay.[7] Dasheme also got a called from Robert Barnes, saying everything was okay. Dasheme talked to Deleon and said Johnson had hit defendant, and Dasheme was going to go check on her.

---

[6] During the trip, defendant called Crowder's cell phone. Crowder missed the call. Crowder considered Johnson a nice person. She could not recall ever hearing him raise his voice. She had seen defendant and Johnson argue, however. Defendant sometimes threatened to hit Johnson or said her sons would take care of him instead of her fighting. Crowder never saw Johnson strike defendant.

[7] Newton, who was in Stockton on the night in question, spoke to defendant sometime around 1:00 a.m. Defendant was crying and said she and Johnson had had a dispute. Because Newton made it a habit not to get involved in domestic matters, the conversation pretty much ended. Newton then called back and spoke with Johnson. Johnson explained he never put his hands on defendant, although he had to push her off of him. He said they were a little tipsy, and she was just mad and being overdramatic and turning over some furniture. Defendant later called Newton back to admit Johnson had not really "jump[ed] on her or anything like that," but they had been fighting, and she had been scared. Newton advised her to call Dasheme, because Dasheme thought Johnson "jumped on" defendant. Later, Newton called Dasheme to tell him he had spoken to defendant, but Dasheme never answered the phone.

During the drive to Modesto, Crowder saw Dasheme holding a silver gun she had seen in his possession on prior occasions. She heard clicking noises and also saw him spinning the gun's cylinder. Crowder was worried the gun might go off in the car. She was also concerned Dasheme might shoot Johnson, so she began to pray.

Crowder testified that when they arrived at defendant's house, everyone got out of the car. Crowder rang the doorbell and Dasheme knocked on the door. After about five minutes, Johnson came downstairs and answered the door. He said, "What's up?" Dasheme replied, "What do you mean what's up?" He was upset and shocked that Johnson had answered the door.

Crowder testified that Johnson was standing in the doorway inside the house, and Dasheme was outside. Dasheme was holding the gun in his right hand, tucked close to his body. Crowder saw a flash. Dasheme then went into the house and stood over Johnson. Johnson said he did not want to die. He was slumped over on the floor by the living room couch, holding his stomach, and Dasheme was pointing the gun at his face. Johnson was pleading for his life.

After Johnson was shot, defendant appeared, and she was screaming and crying.[8] She pushed Dasheme out of the way, told him to get out, and asked him what he had done. Crowder ran to the car and called to Dasheme to come with her.

After the shooting, Dasheme and Crowder stayed in several different hotels in Hayward. Defendant assisted the couple in moving from one hotel to another and apparently paid the bill for at least one hotel.

---

[8] Crowder told Detective Owen defendant was four to five feet behind Johnson when Dasheme fired.

**George Willoughby's Testimony**

Willoughby considered defendant his grandmother, as she and his grandfather once were married.[9]  In 2008, he worked security at after-hours club affairs.

On August 30, Willoughby started work at 1:30 a.m.  At some point, he saw he had an urgent message to call Crowder.  When Willoughby returned the call, Dasheme answered and said they had to go to Modesto because someone was beating on his mother.

Willoughby picked up Dasheme, Crowder, and Vincent, and they headed for Modesto.  Willoughby did not talk to defendant that night or confirm with anyone whether defendant was, in fact, being beaten.[10]  He did not know anyone was going to be killed.  During the drive, Dasheme was on the phone.  Willoughby heard him say he was "coming up there."  Dasheme was involved in about three telephone calls during the trip, but Willoughby did not know to whom Dasheme spoke or hear anything else that was said.  However, he saw Dasheme dump bullets of different calibers into his hand from out of a sock, then pick out five or six .38-caliber rounds.  Prior to this night, Willoughby had

---

[9] Willoughby initially was charged with murder in connection with this case but entered into an agreement to testify in return for which he would plead guilty to being an accessory and receive a year in the county jail.  At some point after his arrest, Willoughby received a letter from Dasheme, telling him to "take the hit," meaning take the rap.  Defendant also sent Willoughby a letter, saying they needed to stay "prayerful."

[10] Willoughby considered Johnson "a good dude" who appeared to get along with people.  Willoughby did not know of any incidents in which Johnson hurt defendant or was involved in a physical altercation with someone.  There were instances, however, in which Willoughby was contacted by defendant and asked to find Johnson because he was gone.  Johnson would take the car, and this upset defendant because it interfered with her ability to conduct her church business.  (Defendant was the founder and pastor of a church in the Bay Area.)  Defendant would get angry and, if she was able to talk to Johnson, she would yell.  Although annoyed, Johnson would just "brush[] it off."  A couple of times when defendant was angry, and she and Johnson were arguing, Willoughby heard her say she was going to call her son.  Sometimes Johnson would tense up when defendant said that, although Willoughby did not think Johnson was afraid of defendant's sons.

seen Dasheme with a silver .38-caliber revolver. After this night, Willoughby did not see that gun again.

Willoughby drove fast, and estimated it took about 30 minutes or slightly longer to get from San Leandro to Modesto. He parked in front of defendant's house. The front porch and interior stairwell lights were the only ones on.

Dasheme got out of the car, followed by the others. They rang the doorbell for five or six minutes before Johnson finally answered. Johnson sounded upset and asked what they were doing at his house. Dasheme responded that he was there to check on his mother. Johnson, who was inside the house, said something to Dasheme, but Willoughby could not remember what. Dasheme tried to push past Johnson into the house, but Johnson stood in front of him, and they started arguing. Johnson was in the living room, and Dasheme managed to step inside the house. Dasheme's right hand was balled up, and his shoulders were angled slightly to the side, like a "stagger stance." Willoughby then heard a pop, and Johnson said, "Don't kill me."

Willoughby, Vincent, and Crowder ran back to the car, and Crowder yelled at Dasheme to come with them. Dasheme then also got in the car. Willoughby started driving, then Dasheme turned and asked who was going to be the first person to fold, meaning to start talking. He was waving his gun back and forth, with the barrel pointing at the other three, at the time. Willoughby said nobody was going to do that. He then drove back to San Leandro and dropped everyone off.

**Lamar Vincent's Testimony**

Vincent recalled being at the San Leandro apartment when Dasheme received a telephone call from defendant. Vincent got the impression there was an altercation going on, and Dasheme was trying to find out what was happening. Then there was a second call, after which Dasheme seemed agitated, frustrated, and angry. He said defendant was having a little trouble, so they were going to go to Modesto. Dasheme did not say what

he was going to do in Modesto, but, on the trip there, Vincent was told Johnson put his hands on defendant.[11]

Vincent fell asleep in the car and woke to find them pulling up to defendant's house.  Everyone got out of the car.  Dasheme knocked on the door, and Johnson answered a short time later.  Dasheme still seemed somewhat agitated, although Vincent did not see anything in his hands.  When Johnson opened the door, Dasheme "burst" inside.  Dasheme was directly inside the door, and Johnson was backed into the living room.  Johnson, who had nothing in his hands, asked what was going on.  Dasheme said Johnson knew what was going on – that he was beating defendant.  Vincent then saw the gun come from Dasheme's right side.  Johnson told Dasheme not to shoot him, but Dasheme fired once at Johnson.  Johnson grabbed his chest and appeared surprised.  He asked why Dasheme shot him.

Johnson was on his knees, hunched over in a fetal position.  Dasheme was "right over him," with the gun pointed at Johnson's head.  Dasheme fired again, but the gun jammed.  Defendant ran downstairs, wearing pajamas.  She was hysterical and asked Dasheme, "Why did you do that?  Why did you shoot him?"  She told Dasheme and the others to get out of there now.  Once they were back in the car, Dasheme waved his gun around and told the others to keep their mouths shut.

Vincent testified that during the drive back to San Leandro, defendant called and said Johnson was fighting for his life, and she was at the hospital.  She was in tears.  Dasheme told defendant he was tired of Johnson doing "it" to her, and she was the one who told Dasheme to come down there and make sure everything was all right.

Vincent spoke with Dasheme a day or two after the shooting.  Dasheme said defendant called him and had him come and do "something" to Johnson.  Defendant later

---

[11] Vincent described Johnson as a good family man who always had a smile on his face.  Vincent never heard him raise his voice or saw him raise his hand to anybody.  Vincent was surprised to hear something was going on between Johnson and defendant.

essentially told Vincent the police had no leads or information, so Vincent should just keep quiet. At some point, Vincent overheard a conversation between Dasheme and Deleon, about Dasheme needing to get rid of his gun and the best way to do it.

**Robert Barnes's Testimony**

Barnes had considered defendant to be a mother figure to him since he was a child. Dasheme and Deleon were like brothers to him. Barnes lived with defendant and Johnson at their Modesto home for several months during 2008. Barnes was aware Johnson struggled with drug addiction. Sometimes, he would leave the house and take the car. This made defendant angry, and she would go find him or call people in the area she knew him to frequent. Defendant was vocal about her anger. Barnes sometimes saw defendant and Johnson argue. Defendant was the primary aggressor. Barnes never saw Johnson lay a hand on her.

Barnes considered defendant to be closer to Dasheme than to Deleon. She and Dasheme had a bond, and Dasheme "[a]bsolutely" felt protective of her. From Barnes's observations, defendant knew how much Dasheme loved her, and she was very involved in his life. Dasheme wrote and performed rap music. Its content varied, but included him talking about street violence, guns, and shooting people. Defendant was Dasheme's agent and producer.

On the night of August 29 to August 30, 2008, Barnes met up with defendant and Johnson in the Bay Area and was going to spend the night at their Modesto home. Upon reaching the house, Barnes took Johnson's truck to go to the grocery store. The others were playing Dominoes, and everyone appeared to be having fun. When Barnes returned 15 to 20 minutes later, however, the mood in the house was "[t]otal tension" between defendant and Johnson. Defendant said Johnson had gotten upset because of a comment someone made about him at church.

Defendant went upstairs to clean her room, and Barnes went out onto the front porch to make a phone call. He was on the phone with a friend for about an hour, at

which point he heard doors slamming upstairs and defendant and Johnson arguing. He could not hear what was being said.

Barnes remained on the phone outside, then Johnson opened the front door and asked him for a cigarette. Barnes knew Johnson did not smoke but gave him a cigarette anyway. Johnson then went back inside and closed the door. Barnes then heard more arguing and slamming doors. Defendant's mother went up the stairs, and there was silence for a few minutes, then Barnes saw Johnson "fly" downstairs with defendant behind him. Defendant was swinging at Johnson, who was backing up, trying to get out of the way, and she turned over the coffee table in the living room. She was saying something like, "You want to challenge me?"

Defendant swung again, and Johnson grabbed her by the biceps and sat her on the couch. He did not strike her. She got back up and started swinging again, and he sat her down again in the same manner. He asked, "Is this what you want me to do? Is this what you want me to do?"

Barnes went inside and asked them what was going on. He did not recall what, if anything, they responded, but defendant went upstairs and into her room.[12] Barnes then went back outside and called his friend. He talked to her for about 30 minutes, during which time he heard more slamming doors and arguing, although he did not see defendant or Johnson. Defendant's mother went upstairs and came back down, after which everything was quiet for 30 minutes to an hour.

Barnes subsequently came back inside. At some point, when he and defendant were in the living room and Johnson was elsewhere, Barnes heard defendant on the phone with Dasheme.[13] Defendant told Dasheme she was five-foot six or five-foot

---

[12] Barnes believed defendant was intoxicated, although he did not see her drinking, because there were alcohol bottles upstairs, and her attitude changed so that she became more combative when she drank.

[13] It is unclear when, in the chronology of events preceding the shooting, this took place.

seven, a little woman, and this "big old man" was beating on her. She said she was scared for her life, and told Dasheme, referring to Johnson, "Come handle this [epithet]."

Barnes demanded to know why she did that and told her, "You f[**]ked up." Defendant replied, "I know. I know." Barnes told defendant she should call Dasheme back and tell him not to come. He knew that if Dasheme got there, "it was gonna be a whole bunch of mess." Barnes thought Dasheme and Johnson were going to fight, but he never thought Dasheme would shoot Johnson. As far as he knew, Johnson and Dasheme got along. Defendant tried to call Dasheme, but Dasheme's phone was off. At some point, Barnes also tried to call Dasheme, but never got through to him.

After Barnes heard defendant talking to Dasheme, he heard her tell Johnson that she had called her son, and he would handle this. Johnson said she should call her sons; if they shot him, he would shoot them back, and if they stabbed him, he would stab them back. Shortly after, Johnson started looking for his car keys. Defendant had them. She did not give them to Johnson. At some point, Barnes overheard defendant tell Newton she had called Dasheme. Barnes could tell Newton was worried about that.

Defendant told Barnes and Johnson that when Dasheme arrived, they would not answer the door. She said to act like nothing happened. Barnes continued to plead with defendant to call Dasheme and tell him it was not serious and not to come.

Later, Barnes was upstairs in the master bedroom, along with defendant, Johnson, and Crystal Pettis. Everyone seemed to be getting along, so Barnes thought the incident was over, and he was no longer particularly concerned that Dasheme would show up at the house.

After a time, while they were discussing a lesson defendant was going to teach the next morning at a church, the doorbell rang. Johnson, who was on the computer, said, "Somebody's at the door." Defendant, who was lying in bed, responded, "Well, you're bad. Go answer it."

11.

Johnson went to answer the door, and defendant followed some 10 to 20 seconds later.[14] Barnes thought Dasheme was there, so he looked out the upstairs window. When he saw Willoughby's car, he opened the window and called out that it was not that serious and to go home. Nobody responded. Barnes heard the front door creak open and Johnson saying, "No, no." Almost immediately, he heard a gunshot. He then heard defendant saying, "Oh, my God, Karl's been shot."

Barnes went downstairs. There was blood from the right side of the staircase, back through the living room and kitchen. Johnson was lying on the linoleum and the carpet between the living room and kitchen. He was a pale blue, and there was blood on the shirt covering his abdomen. Defendant was with him, holding him and slapping him to try to wake him up. She told him she loved him and was sorry.

Barnes got some towels to try to compress the wound, then called 911 when he realized nobody else had done so. When he told the 911 operator someone had been shot, defendant told him not to say that. Later, at the hospital, defendant told Barnes not to say anything about Dasheme being at the house.

**The Investigation**

At approximately 4:47 a.m. on August 30, 2008, officers were dispatched to defendant's home in response to a call of a shooting that had just occurred. Upon arrival, they found the front door open. Inside, Johnson was lying, conscious, on the floor in the

---

[14] Barnes believed Johnson had a box cutter in his shorts. One was turned over to police with his clothes after his death. In one of her interviews with police, defendant related that Johnson had worked for a grocery store more than a year before his death, and that, as a result of his employment, he had gotten into the habit of carrying a box cutter in his pocket. Defendant said Johnson kept the box cutter on his person for his protection.

Martha Holt was Johnson's sister. Sometimes when Johnson was in trouble, he would telephone Holt in the middle of the night, and she would offer him a place to go. Around 4:30 a.m. on August 30, Holt received a call, but, because she was sleeping, it went to voicemail instead of being answered. Caller identification showed the call was from Johnson's cell phone. Holt tried to call Johnson back but got no response.

kitchen area. Defendant was kneeling next to him. She was hysterical and yelling, "He's been shot, help him." Officer Beavers observed a gunshot wound to the right side of Johnson's chest area and another to his right bicep. Defendant said the shooting had occurred at the front door when Johnson went to answer it in response to the doorbell ringing. However, although there was a blood trail leading from the couch in the living room area to the kitchen entryway where Johnson was located, there was no blood in the area of the front door.[15]

Johnson died at 7:23 that morning. His blood-alcohol content was 0.14 grams. An autopsy revealed a gunshot wound to the right side of his abdomen. The bullet penetrated the abdominal cavity, liver, small and large intestines, mesentery, and abdominal aorta, and was lodged in the left side of the abdominal wall. There was also a through-and-through gunshot wound to the upper right arm, just above the elbow. The cause of death was gunshot wounds to the abdomen and right arm, with excessive loss of blood.

Detective Stanfield spoke with defendant at the hospital shortly after 8:00 a.m. Defendant was crying and shaking. Defendant related that she and Johnson were upstairs around 3:30 a.m. Defendant was working on a class she was preparing to teach for Sunday school, while Johnson was using the computer. Johnson said he heard the doorbell ring and defendant thought it was a knock, and they both kind of laughed about the fact someone was at the door at that hour of the morning.[16] Johnson went downstairs

---

[15] A police officer who spoke with defendant around 5:20 a.m. noticed a strong odor of alcoholic beverage emanating from her person.

[16] According to what defendant told Froilan Mariscal, an investigator for the district attorney's office, defendant and Johnson debated who should go down and answer the door. Defendant said Johnson did not feel like going downstairs, but she kept pushing him to do it until he finally agreed. When Mariscal asked defendant if she had any idea who might have shot Johnson or any reason somebody would want to shoot him, defendant replied, "Me and Karl [Johnson] have had our differences." She then said she did not know anyone who would want to shoot him.

to answer the door, and as defendant went down the stairs after him, she saw Johnson staggering back to the sofa. He said he had been shot. Defendant told Stanfield she did not hear any gunshots or any cars driving away.[17] She assisted Johnson to the kitchen/dining room area and started administering first aid while 911 was called. The paramedics then arrived and transported Johnson to the hospital.

Later that morning, defendant agreed to go to the police department to give a statement. She was not under arrest. Her demeanor during the interview was friendly and helpful, though tired and depressed. During the course of the interview, defendant gave her sons' names as "Deleon Abdul Hosley" and "Kareme Hosley." She said Kareme did not have a middle name.[18] She said he lived in Oakland, but she did not know where exactly. She said she did not see him often and did not know his phone number. When Detective Evers looked through defendant's cell phone, Dasheme's name and number were there. Defendant also initially said Barnes did not have a cell phone but identified his phone number once Evers found it in her cell phone's memory. Defendant told Evers that, before coming to the police station, she erased most of the calls placed on her phone in order to save memory. There were no calls on her phone's call list prior to 12:17 p.m. on August 30, 2008.

During the interview, defendant informed Detective Grogan there was no domestic violence in her relationship with Johnson, and Johnson had never struck her. Grogan saw no signs on her person of a physical altercation.

Detective Grogan conducted a second interview with defendant on September 25, 2008, following her arrest. During this interview, defendant said she and Johnson had

---

**17** At approximately 4:30 a.m. on August 30, Patrick Collins, who lived nearby, was awakened by what sounded like boxes falling and hostile voices. He then heard what he believed to be three gunshots. He saw a car take off. The car had a loud exhaust system.

**18** Dasheme's full name is Dasheme Kareme Hosley. Barnes called him "Dasheme." Barnes heard defendant call him "Kareme" but only occasionally.

had an argument starting shortly after they arrived home around 11:00 p.m. on the night of the shooting, and continuing until around 2:00 a.m. Defendant first said Johnson was getting ready to leave, and she grabbed him to stop him. He put up his hands as if to say not to touch him. Defendant said neither of them hit the other. Later in the interview, however, defendant said that when she grabbed defendant to stop him, he turned and grabbed her by the throat. They then lost their balance and fell over the coffee table and onto the couch. Defendant continued to maintain she was in the stairwell when Johnson was shot and did not see who did it.

During this interview, defendant said she talked to "Kareme" the night before the shooting. She first said she spoke to him about a family barbecue she was planning. Later, she said she had been upset because of her argument with Johnson and had told "Kareme" she was tired of "this struggle." She said he would understand she meant Johnson and their troubles over finances and Johnson's not working. She said she was crying and upset when she called her son and told him she had been choked. Confronted with the fact she was not referring to her son by his true name, defendant explained that Dasheme's behavior seemed to have changed, and so she started to call him "Kareme" later in his life. When informed there were telephone intercepts in which she told people to call him "Kareme," defendant said she thought everyone should call him that name from that point on.

Defendant told Detective Grogan that when she saw Johnson back away from the front door, she went to help him, and he collapsed. She pulled him toward the kitchen because she wanted to see his injury in the light. Asked why she did not turn on the light in the living room, defendant said she was not thinking about it at the time.

Defendant said she did not know when Johnson's call to his sister was made. Asked about calls to Dasheme that were placed after that call, defendant said she called Dasheme on two occasions to let him know she was okay. She said she hung up before she reached Dasheme and did not speak to him.

15.

At some point, defendant admitted she was suspicious Dasheme was involved and may have shot Johnson because he was protective of defendant. Defendant said she held this belief early in the investigation.[19] Although Detective Grogan had given defendant an update on the case on September 10 and had discussed possible leads and motives with her at that time, defendant never mentioned her suspicions about Dasheme.

Phone records and cell tower information led to wiretap warrants targeting defendant's and Dasheme's cell phones. Evidence of phone records, text intercepts, phone conversation intercepts, and cell tower information regarding the location of cell towers servicing particular calls was presented.[20] The evidence corroborated portions of the testimonies of Crowder and Willoughby, as well as Vincent and Newton.

## DEFENSE EVIDENCE

Detective Munoz interviewed Barnes on three occasions. Barnes told Munoz several times that he was scared. Barnes said he called 911 after defendant shouted for someone to call and also told Barnes directly to call. With respect to the physical scuffle between defendant and Johnson, Barnes related that Johnson grabbed defendant by both arms, shook her, and then threw her down to the couch. Defendant got back up and knocked over the coffee table, whereupon Johnson threw her back down. Barnes told Munoz he had never seen Johnson shake defendant the way he did. Barnes also told Munoz that defendant said she called Dasheme. Barnes said he was present when she made a phone call to Dasheme, and he overheard her say, "Um, son, Momma's got it. Momma's okay. Momma's all right. Don't come here."

---

[19] Defendant was aware Dasheme had been arrested a few days before this interview.

[20] Audio recordings of some of the intercepted calls were played for the jury.

16.

**PROCEDURAL BACKGROUND**

On January 15, 2010, defendant and Dasheme were jointly charged with first degree murder of Johnson. Dasheme was tried separately.[21]

On October 22, 2010, after a jury trial, defendant was convicted of the lesser included offense of second degree murder.

On April 17, 2012, the court held a hearing on defendant's motion for new trial or to reduce the conviction to manslaughter, based on the argument that defendant's culpability was "marginal" and there was insufficient evidence that she had the intent to kill.

Defense counsel argued that while Barnes testified that defendant told Dasheme to come and "handle" Johnson, Barnes was not credible. There was no evidence defendant told Dasheme to shoot Johnson, that she knew Dasheme had a gun, or he was inclined to shoot anyone.

The prosecutor replied that Barnes was credible, and he told defendant that night that she needed to stop Dasheme from coming over because he was only going to bring violence to the house. The prosecutor further argued that when Dasheme arrived at the house, defendant knew he was there but insisted Johnson answer the door, "knowing she had created a situation in Dasheme where he felt it was necessary to defend his mother, and she knew he had a violent propensity."

The prosecutor argued the evidence showed defendant knew Dasheme would come to the house and "carry out the violence that he did, and knowing that she brought it anyway." The prosecutor argued the jury convicted her of second degree murder based on

---

[21] In the nonpublished opinion of *People v. Dasheme Hosley* (May 14, 2014, F065500), this court affirmed Dasheme's conviction from his separate trial for first degree premeditated murder of Johnson, and his sentence for five years plus 75 years to life. *Hosley* further states that Deleon and Brown were separately charged with being accessories (§ 32), a charge to which they pleaded guilty and no contest, respectively.

17.

CALCRIM No. 520, that she committed an act that caused the death of another person, she had the state of mind of malice aforethought when she acted, and the jury convicted her based on implied malice "that she had intentionally committed an act of bringing Dasheme to the household and sending [Johnson] to that door, the natural and probable consequences of that act was dangerous to [Johnson's] life, and at the time she acted in that capacity she knew that her act was dangerous to [Johnson's] life, and she deliberately acted with a conscious disregard for [Johnson's] life."

The court denied the motion for new trial, noted it had the opportunity to hear the evidence and consider the credibility of the witnesses, and found it "very significant" that defendant had Johnson answer the door, knowing that Dasheme was there.

Thereafter, defendant was sentenced to 15 years to life.

**Defendant's Appeal**

On May 22, 2014, this court filed the nonpublished opinion that affirmed defendant's conviction. (*People v. Harris*, *supra*, F065104.) In response to her insufficient evidence challenge, this court held there was substantial evidence to support defendant's conviction for "implied malice murder." The jury was instructed that a person could be guilty of a crime in two ways: either as the direct perpetrator or by aiding and abetting a perpetrator who directly committed the crime. (See § 31; *People v. Maciel* (2013) 57 Cal.4th 482, 518.) With respect to aiding and abetting, jurors were instructed:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> "Number one, the perpetrator committed the crime;
>
> "Number two, *the defendant knew that the perpetrator intended to commit the crime;*
>
> "Number three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and

18.

"Four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime." (*People v. Harris*, *supra*, F065104, at p. 17, italics added.)

We further stated: "*Jurors were instructed on natural and probable consequences only in terms of causation. They were not instructed on the natural and probable consequences doctrine as it relates to aider and abettor liability*. (See generally *People v. Prettyman* (1996) 14 Cal.4th 248, 261–262.) Thus, they were not instructed on assault as a target crime for purposes of murder, but merely in terms of it being the crime committed for purposes of involuntary manslaughter. ' "[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator,' and when the crime is murder, the "aider and abettor must know and share the murderous intent of the actual perpetrator." [Citation.] "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' (*People v. Maciel, supra,* 57 Cal.4th at p. 518.)" (*People v. Harris*, *supra*, F065104, at p, 18, fn. 21, italics added.)

We then turned to defendant's arguments:

"Defendant says that while there potentially was *some* evidence, there was no *substantial* evidence to establish the second element, that she knew Dasheme intended to kill Johnson. We need not decide whether defendant is correct, because, on the facts of this case, jurors could not have concluded defendant knew Dasheme intended to kill Johnson – or herself harbored an intent to kill – without also concluding defendant premeditated and deliberated. Because jurors convicted defendant of second degree murder, not first degree murder, it necessarily follows they convicted her based on a theory of direct, rather than derivative, liability (see *People v. Perez* (2005) 35 Cal.4th 1219, 1226), and found she acted with implied

19.

malice. Since, as we will explain, there was sufficient evidence to support defendant's conviction on an implied malice theory, any evidentiary insufficiency with respect to the elements of aiding and abetting does not require reversal. (See, e.g., *People v. Rundle* (2008) 43 Cal.4th 76, 140–141, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Aguilar* (1997) 16 Cal.4th 1023, 1034; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129, 1130; *People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306–1307.)" (*People v. Harris*, *supra*, F065104, at p. 18, fn. omitted.)

We reviewed express and implied malice, that "[m]alice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another …." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) We noted that defendant's jury was instructed:

> " 'The defendant acted with implied malice if:
>
> " 'One, she intentionally committed an act;
>
> " 'Two, the natural and probable consequences of the act were dangerous to human life;
>
> " 'Three, at the time she acted she knew her act was dangerous to human life; and
>
> " 'Four, she deliberately acted with conscious disregard for human life.' " (*People v. Harris*, *supra*, F065104, at p. 19.)

We concluded:

> "Viewed in the light most favorable to the prosecution, the trial evidence showed defendant deliberately set in motion the events culminating in Johnson being killed. She intentionally lied to Dasheme, telling him Johnson had beaten her, and ordered him to come and 'handle' Johnson. She told Dasheme this while knowing he was protective of her, could be violent, and possessed (or at least had access to) a firearm. Defendant herself could be violent, and had told Johnson on more than one occasion that she would call her sons to handle matters. Although

20.

Dasheme and Johnson normally had a decent relationship and Johnson usually may not have considered this to be a threat, he himself recognized the potential for violence when he talked about shooting or stabbing Dasheme back if Dasheme shot or stabbed him. Johnson tried to leave, but defendant deliberately thwarted his attempt. Barnes and Newton both were concerned Dasheme would bring violence to the house, and defendant recognized she did wrong by calling and lying to him. A rational juror could infer she too was concerned about the potential for violence, otherwise she would not have felt the need to plan what to do upon his arrival and to tell Barnes and Johnson that she and they would not answer the door. Although she apparently tried to call Dasheme off, she knew she had not succeeded. Yet, when Dasheme arrived – and, given the early hour of the morning, jurors reasonably could have inferred she knew it could only be Dasheme – she sent Johnson to answer the door, even though she knew or should have known Dasheme would want to see for himself that she was well. Although defendant was not the actual killer, her culpability arose from her own conduct and mental state (see *People v. McCoy* (2001) 25 Cal.4th 1111, 1120), which were such that a rational trier of fact could conclude she committed implied malice murder." (*People v. Harris*, *supra*, F065104, at pp. 19–20.)

As to her other appellate issues, we held defendant's claims of prosecutorial misconduct lacked merit, the court did not improperly permit a prosecution witness to testify as an expert about the wiretap and cell phone evidence, and counsel was not ineffective.

## SENATE BILL NOS. 1437 & 775

Under prior California law, a defendant who aided and abetted a crime, the natural and probable consequence of which was murder, could be convicted not only of the target crime but also of the resulting murder. (*People v. Chiu* (2014) 59 Cal.4th 155, 161, superseded by statute on other grounds as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3 (*Lewis*).) This was true irrespective of whether the defendant harbored malice aforethought. Liability was imposed " 'for the criminal harms [the defendant] … naturally, probably, and foreseeably put in motion.' " (*Id.* at pp. 164–165; *In re R.G.* (2019) 35 Cal.App.5th 141, 144.)

The instant appeal is from the denial of defendant petition for resentencing that she filed pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), that was effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, *did not act with the intent to kill*, *or was not a major participant in the underlying felony who acted with reckless indifference to human life*.' " (*Lewis*, *supra*, 11 Cal.5th at p. 959, italics added.)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' [Citation.]" (*Lewis, supra*, 11 Cal.5th at p. 957.) The court's failure to appoint counsel only constitutes state error subject to review under *People v. Watson* (1956) 46 Cal.2d 818. (*Lewis, supra*, 11 Cal.5th at p. 973.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra*, 11 Cal.5th at p. 974.) After appointing counsel, the trial court could rely on the record of conviction to determine whether the prima facie showing is made "to distinguish petitions with potential merit from those that are clearly meritless." (*Id.* at

23.

p. 971.) The record of conviction includes a prior appellate opinion, although it will be case-specific. (*Id.* at p. 972.) The prima facie finding under section 1170.95, subdivision (c) is limited, and the court must accept the petitioner's factual allegations as true and cannot reject the allegations on credibility grounds without conducting an evidentiary hearing. (*Lewis*, at p. 971.) " 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] [T]he 'prima facie bar was intentionally and correctly set very low.' " (*Id.* at p. 972.)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020–2021 Reg. Sess.; Stats. 2021, ch. 551, § 1 (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that "a person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a).)

The amendments also codified the holding in *Lewis* that a petitioner has the right to appointment of counsel, if requested, prior to the court making the prima facie finding. (§ 1170.95, subd. (b)(3).) After appointment of counsel, the parties shall have the opportunity to submit briefing, and "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (*Id.*, at subd. (c).)

If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order

24.

to show cause, it shall provide a statement fully setting forth its reasons for doing so. (§ 1170.95, subd. (c).) If the court issues the order to show cause and conducts a hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (§ 1170.95, subd. (d)(3).)

"The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022.)

### DEFENDANT'S SECTION 1170.95 PETITION

On January 9, 2019, defendant filed, in pro. per., a petition in the superior court for resentencing of her second degree murder conviction pursuant to section 1170.95. Defendant requested appointment of counsel.

The petition was supported by defendant's declaration, signed under penalty of perjury, that the prosecution proceeded against her under the natural and probable consequences doctrine, and she was convicted of second degree murder pursuant to that doctrine; she was not the actual killer and did not, with the intent to kill, aid, abet, counsel, command, solicit, request, or assist the actual killer in the commission of murder

25.

"in the first degree," she was not a major participant, and did not act with reckless indifference to human life during the course of the crime; she was sentenced for second degree murder under the natural and probable consequences doctrine, and she could not now be convicted of murder because of the changes to section 188.

Defendant also checked boxes on a preprinted form, that stated she was entitled to resentencing under section 1170.95 because a complaint or information was filed against her that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, she was convicted of first or second degree pursuant to the felony-murder rule or the natural and probable consequences doctrine; and she could not now be convicted of first or second degree murder under the amended versions to sections 188 and 189.

The superior court appointed counsel to represent defendant.

**The Prosecution's Opposition**

On February 28, 2019, the People filed opposition, with this court's appellate opinion as a supporting exhibit, and argued the evidence showed defendant was not eligible for relief under section 1170.95 because she was a "major participant" and "acted with reckless indifference to human life" as defined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).[22]

As to being a major participant, the People argued:

"[I]t was the Defendant's plan that led directly to the death of the victim. But for the defendant's malicious and calculating plan, this murder would not have occurred. She orchestrated all of the events surrounding the murder. She manipulated her violent son by lying to him and telling him the victim had beat her and that he needed to 'take care of it.' The evidence at trial demonstrated she was the aggressor and she had not been beaten by

---

[22] The prosecution's opposition also asserted Senate Bill 1437 was unconstitutional; defendant filed objections to that argument. At the hearing on the petition, the superior court noted the issue was not settled but presumed the law was constitutional to reach the merits.

26.

the victim on the night of the murder. [¶] After the criminal endeavor was complete, she made efforts to shield her son from getting caught. Defendant played an integral role that directly led to the murder. Under *Banks*, it is clear that she is a major participant."

As for reckless indifference, the People further argued:

"The Defendant called her violent son and told him to 'come take care of the situation' after she lied to him about being physically abused by the victim. The evidence at trial demonstrated she made up the allegation to inflame her son into taking care of the victim. Witnesses asked the Defendant to tell her son that nothing had really happened to her because they were afraid of what her violent son would do to the victim. Additionally, when the Defendant's son knocked on the door, she insisted that the victim answer the door knowing that it was her son knocking with the instruction from her to 'take care of the situation.' Defendant was a willing major participant who, by her willful action, had full knowledge that her son would hurt or kill the victim. The grave risk to human life was readily apparent to the Defendant but she willingly set her plan in motion to 'take care of the victim.' Her knowing, highly-dangerous actions led to the victim being killed, which is implied malice."

**Defendant's Reply**

On August 9, 2019, defendant, represented by counsel, filed a reply to the prosecution's opposition, and the argued the jury did not receive a "major participant" instruction and the phrase was not defined in any of the instructions that were given.

Defendant further argued she did not qualify as a major participant, she was not the actual killer, and she was convicted under the natural and probable consequences theory that was no longer valid. In making this argument, defendant cited to language in the instructions and the prosecutor's closing argument that defined implied malice and aiding and abetting. Defendant further argued that as a result of Senate Bill 1437, "there is no second degree murder" because "liability for murder cannot be imposed when the person is not the actual killer and did not act with intent to kill," and defendant was not the actual killer and did not act with intent to kill.

**The Court's Denial of the Petition**

On October 16, 2019, Judge Ashley, who presided over defendant's jury trial, held the hearing on her section 1170.95 petition. Defendant was present with her attorney and did not offer any evidence in support of the petition. The court invited arguments from the parties.

Defendant's attorney argued that as a result of Senate Bill 1437, defendant was no longer "equally guilty" with the actual killer, because she was convicted under the natural and probable consequences theory based on "her act of bringing her son to the household and sending her husband to open the front door," and the prosecutor compared her to a "getaway" driver in a robbery in closing argument, but that theory no longer applied. Counsel further argued that defendant's conduct did not amount to the higher standard of reckless indifference because she did not know her son had a gun, he would bring it to his house, and he would shoot and kill her husband. Counsel argued there was no evidence defendant ordered her son to kill her husband, and she tried to help him after he was shot.

The prosecutor replied the evidence showed defendant was a major participant because she called her son "and feigned being beat up by the husband and told him he needed to come over and take care of this, knowing that he would be taken care of by her son. So even the appellate court opined this decision that, although the defendant was not the actual killer, her culpability arose from her own conduct and mental state. And the appellate court found there was sufficient evidence to show implied malice, meaning she knew what she was going was dangerous to human life. So she put this whole chain of events into motion."

The prosecutor further argued that the victim would not have been killed but for defendant "faking" the beating by her husband and instructing her son to "take care of it." Defendant knew "darn well … that what she did created a situation that was dangerous to human life."

The court denied defendant's petition:

28.

"[H]aving presided over the trial and hearing the evidence for myself, I totally agree with the prosecution, that but for [defendant's] actions, it never would have occurred. And what was extremely compelling was the fact that she did encourage her husband to open the door. [¶] So that being the case, the standards as cited by the prosecution that she was a principal, basically, and aided and abetted, but for her actions, it never would have occurred. So the petition will be denied."

On October 28, 2019, defendant filed a notice of appeal from the superior court's order of October 16, 2019, that denied her section 1170.95 petition.

## DISCUSSION

As noted above, defendant's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that defendant was advised she could file his own brief with this court. By letter on January 11, 2021, we invited defendant to submit additional briefing. To date, she has not done so.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.[23]

## DISPOSITION

The order is affirmed.

---

[23] As required by *Lewis* and section 1170.95, the court appointed counsel to represent defendant, held a hearing on the petition and invited argument from both parties, and the defense failed to introduce any evidence. The superior court properly relied on the record and this court's opinion from her first appeal to deny the petition because she was convicted as a direct aider and abettor. (See, e.g., *Lewis, supra*, 11 Cal.5th at pp. 971–972.) The record of conviction demonstrates she was convicted of murder as a direct aider and abettor, and not under the natural and probable consequences doctrine, the felony murder rule, or any theory under which malice is imputed to a person based solely on that person's participation in a crime. While defendant argued that she was convicted under the natural and probable consequences theory, she cited language in the instructions for implied malice and direct aiding and abetting, as set forth in this court's prior opinion. Senate Bill 1437 eliminated the natural and probable consequences liability for second degree murder based on imputed malice, but implied malice and direct aiding and abetting remain valid theories of second degree murder. (*People v. Gentile, supra*, 10 Cal.5th at p. 850; *People v. Cortes* (2022) 75 Cal.App.5th 198, 201–202; *People v. Rivera* (2021) 62 Cal.App.5th 217, 232.)